The ST. LOUIS RAMS LLC, f/k/a The
St. Louis Rams Partnership,
Respondent,

v.

DIRECTOR OF REVENUE, Appellant.

No. SC 95910

Supreme Court of Missouri,
en banc.

Opinion issued August 1, 2017

Emily A. Dodge of the attorney general's office, Jefferson City, MO, for the Director.

Matthew S. Mock, Theodore R. Bots and Laura Grace Mezher of Baker & McKenzie LLP, Chicago, IL, and Bradley A. Winters of Sher Corwin Winters LLC, St., Louis, MO, for the Rams.

George W. Draper III, Judge

The Administrative Hearing Commission (hereinafter, "Commission") determined The St. Louis Rams LLC f/k/a The St. Louis Rams Partnership (hereinafter, "the Rams") were entitled to a refund of state sales tax paid, plus statutory interest, for the period from February 1, 2007, through January 31, 2010. The Commission also determined the Rams were not liable for state sales tax and interest assessed by the director of revenue (hereinafter, "the director") for periods from February 1, 2010, through January 31, 2013. The director seeks judicial review of the Commission's decision. This Court has jurisdiction pursuant to article V, section 3 of the Missouri Constitution. The Commission's decision is reversed, and the cause is remanded.

**Factual and Procedural History**

The Rams sold tickets for the exhibition of National League Football games played in the City of St. Louis (hereinafter, "the city"). Pursuant to ordinance No. 65669, ordinance No. 68380, and the city's revised code chapter 8.08, the city imposed upon the Rams an "entertainment license tax" (hereinafter, "the ELT"). The ELT provides:

Any person or persons, partnership of whatever form, or corporation in the business of admitting persons or groups upon payment of an admission charge to a ... sporting event, including but not limited to ... football ... are taxed upon the amount of gross receipts derived from such admission charges at the rate of five percent....

Chapter 8.08.010. Chapter 8.08.060 requires those subject to the ELT to apply for a "gross receipts license" prior to commencing business. Upon payment of the ELT, the city "shall issue the license as hereinafter provided...." Chapter 8.08.020. The Rams chose to pass their obligation to pay the ELT through to ticket purchasers who sought admission to football games played in the city. When the Rams collected and remitted the ELT to the city, the city issued the Rams a gross receipt license to operate their business in the city.

From February 1, 2007, through January 31, 2013, the Rams collected and remitted the ELT to the city. The Rams included the ELT they collected as part of their gross receipts in their sales tax returns filed with the director for the period of February 1, 2007, through January 31, 2010. In April 2011, the Rams applied for a refund of state sales tax paid equal to the ELT they included in their gross receipts, alleging the ELT was included erroneously. The director denied the Rams' application. In December 2011, the Rams petitioned for a refund and requested an evidentiary hearing before the Commission.

The Rams did not include the ELT they collected in their gross receipts when calculating state sales tax for the period of February 1, 2010, through January 31, 2013. The director audited the Rams, determined the Rams failed to collect or

remit sales tax on five percent of the ticket sales, and found the Rams owed state sales tax. In August 2013, the Rams filed a petition challenging the assessment and requested an evidentiary hearing before the Commission. The Rams asserted similar legal arguments and defenses for their December 2011 refund petition in this action. The parties filed a joint motion to consolidate the cases, which the Commission sustained.

The parties filed two joint stipulations. The first stipulation stated the Rams remitted state and local sales tax, as well as the ELT, on the amounts charged for admission from February 1, 2007, through January 31, 2013. The second stipulation contained an authentic copy of the city's ordinance governing the ELT.

The parties filed competing motions for summary decision. The Commission issued a decision in the Rams' favor. The Commission stated the issue to be resolved was whether the ELT was included in "the amount paid" as stated in section 144.020.1(2).[1] The Commission found the ELT was an occupational tax because it required the Rams to obtain a license to conduct the business of charging admission to professional football games and, as a condition of maintaining the license, to pay a portion of their gross receipts to the city through the ELT. The Commission determined the taxing statute was ambiguous and construed it against the director, finding, in both cases, the director attempted to impose a tax upon a tax. The Commission ordered the director to issue a refund to the Rams for the ELT erroneously included in the February 2007 through January 2010 periods. The Commission also found the Rams were not liable for sales tax based on the ELT collected and remitted from February 2010 through January

2013. The director seeks judicial review of the Commission's decision.

## Standard of Review

This Court will affirm the Commission's decision when it is "authorized by law and supported by competent and substantial evidence upon the record as a whole unless clearly contrary to the reasonable expectations of the General Assembly." *Krispy Kreme Doughnut Corp. v. Dir. of Revenue*, 488 S.W.3d 62, 67 (Mo. banc 2016) (quoting *801 Skinker Blvd. Corp. v. Dir. of Revenue*, 395 S.W.3d 1, 3-4 (Mo. banc 2013) (internal quotation omitted)); *see also* section 621.193. This Court reviews the Commission's interpretation of a revenue statute *de novo. IBM Corp. v. Dir. of Revenue*, 491 S.W.3d 535, 538 (Mo. banc 2016).

## Analysis

The director argues the Commission erred in finding the portion of the ticket sales the Rams used to pay the ELT was not subject to sales tax. The director contends the ELT was included in the amount ticket purchasers paid for admission via the fixed ticket price charged by the Rams.

"This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Krispy Kreme Doughnut Corp.*, 488 S.W.3d at 70 (quoting *Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009)). This Court interprets statutes in a way that is not hyper-technical but, instead, is reasonable, logical, and gives meaning to the statute and the legislature's intent as reflected in the statute's plain language. *Fred Weber Inc. v. Dir. of*

1. All statutory references are to RSMo Supp. 2013.

*Revenue*, 452 S.W.3d 628, 630 (Mo. banc 2015).

■ Missouri sales tax is a gross receipts tax imposed upon the seller. *Cent. Hardware Co., Inc. v. Dir. of Revenue*, 887 S.W.2d 593, 594 (Mo. banc 1994). Section 144.010.1(4) defines "gross receipts" as "the total amount of the sale price of the sales at retail." This section further provides, for the purposes of the sales tax law, "the total amount of the sale price above mentioned shall be deemed to be the amount received." Section 144.010.1(11)(a) provides "sales at retail ... shall be construed to embrace [s]ales of admission tickets, cash admissions, charges and fees to ... games and athletic events."

Section 144.020.1(2) provides for sales tax to be imposed "on the amount paid for admission and seating accommodations, or fees paid to ... games and athletic events." *See also Eighty Hundred Clayton Corp. v. Dir. of Revenue*, 111 S.W.3d 409, 410 (Mo. banc 2003). Section 144.010.1(1) defines "admission" to include "seats and tables, reserved or otherwise, and other similar accommodations and charges made therefor and amount paid for admission, exclusive of any admission tax imposed by the federal government or by [the sales tax law]."

The director's argument relies on the presumption the ELT was included in the price of admission paid by ticket purchasers. The Rams disagree, pointing to a statement in the first joint stipulation, which the Commission adopted as a finding of fact. The first joint stipulation stated the Rams remitted state and local sales tax, as well as amounts due for the ELT, on amounts charged for admission. The Rams believe this statement demonstrates the ELT collected and remitted "necessarily was not paid to the Rams for admission."

This Court disagrees with the Rams' interpretation of the stipulation and the Commission's reliance upon that interpretation. No language in the stipulation or the Commission's finding resolves whether the ELT was included in the price of admission or whether it constituted a separate charge, especially when there is no dispute the Rams passed their obligation to pay the ELT through to ticket purchasers. Ticket purchasers paid a fixed dollar amount to gain admission to football games. Had the ticket purchasers declined to pay the fixed price the Rams charged—in effect declining to pay the ELT—it stands to reason the Rams would not have issued tickets to those purchasers or allowed them to be admitted into the football game, despite their assertion the ELT was not necessarily paid for admission. Hence, the Rams structured the collection of the ELT in such a way that it was included in "the amount paid for admission" as contemplated under section 144.020.1(2).

The director also maintains the statutory definition of "admission" does not exclude the ELT. The definition of "admission" expressly excludes "any admission tax imposed by the federal government or by [the sales tax law]." Section 144.010.1(1). The director argues the ELT does not fall within either of these express exclusions in that the ELT is not an admission tax imposed by the federal government and it is not a sales tax. A plain reading of the statute supports the director's position. However, the Rams counter that taxes collected by a seller in connection with a taxable sale are not subject to sales tax. Likewise, the Rams claim the exclusion listed in the definition of "admission" should be read as illustrative examples, and includes taxes not listed expressly, such as the ELT. The Rams cite *Moore Leasing, Inc. v. Director of Revenue*, 869

S.W.2d 760 (Mo. banc 1994), to support these propositions.[2]

In *Moore Leasing,* the director assessed sales tax on personal property tax payments made by a motor vehicle leasing company's customers. The lease agreement entered into between the leasing company and its customers provided lessees make monthly rental or lease payments and lessees were billed for personal property tax annually. The leasing company paid sales tax on the lessees' monthly payments. The leasing company forwarded personal property tax assessments on the leased vehicles to the lessees for payment. The lessees were given the option to pay the personal property tax directly to the collector of revenue or pay the leasing company, which would then forward the personal property tax to the collector of revenue. *Id.* at 760-61. When the leasing company forwarded payments on behalf of its lessees to the collector of revenue, the director assessed sales tax on those payments. *Id.* at 761.

This Court held the director was not authorized to assess sales tax on the lessees' personal property tax payments routed through the leasing company because it effectively amounted to a tax on a tax. This Court explained section 144.070, RSMo 1986 specifically governed sales tax liability for motor vehicle leasing companies; thus, analyzing only the general gross receipts provision of section 144.010 did not resolve the issue. *Id.* This Court found section 144.070.5 was ambiguous and construed the statute against the taxing authority. *Id.*

Here, the Commission determined *Moore* was not controlling authority because different taxing statutes were at issue.[3] This Court agrees. *Moore*'s construction of section 144.070, governing the sales tax implications of purchasing or leasing a motor vehicle, does not speak to the specific issue of sales tax due on admissions governed by section 144.020.1(2). Moreover, the monthly leasing payments in *Moore* were separate and distinct from the personal property tax payment, thus distinguishing it from the case at bar, in which the Rams passed the ELT through to ticket purchasers who paid a fixed price for admission. Finally, in *Moore,* the lessee was obligated to pay the personal property tax, not the leasing company. The Rams are obligated to pay the ELT as a cost of doing business; there is no requirement a ticket purchaser incur that cost.

Relatedly, the Rams contend only the amount ticket purchasers paid for "admission" is taxable and, although the Rams passed through and collected the ELT from ticket purchasers via a fixed-price ticket, the ELT should be excluded from the sales tax base. The Rams rely on *ITT Canteen Corporation v. Spradling,* 526 S.W.2d 11 (Mo. 1975), for the proposition the entire amount collected by a seller is

**2.** The Rams also cite 12 C.S.R. 10-103.800(2)(E), which states, "Amounts charged to and received from purchasers as tax are not included in gross receipts."

**3.** The Commission later declared section 144.020.1(4) ambiguous, relying on a footnote in *Moore* comparing language from section 144.070, applying to motor vehicle leasing companies, and section 144.010.1(4), defining gross receipts. *Moore,* 869 S.W.2d at 761, n.2. This Court presumes the Commission's citation to section 144.020.1(4) is a typographical error in that section 144.020.1(4) concerns the sales tax calculation for telecommunication services and equipment, which is not at issue in this case. It is unclear whether the Commission intended to cite section 144.010.1(4), defining gross receipts, as the director speculates, or section 144.020.1(2), governing sales tax on admission, as the Rams assert. Given this Court's resolution of the case, we need not resolve this discrepancy or speculate about the Commission's interpretation. It is worth noting neither party contends now that any of the statutes at issue are ambiguous.

not deemed always to be the taxable amount includable in the sales tax base. The Rams' reliance on this case is misplaced.

In *ITT Canteen*, a cigarette seller challenged a ruling requiring it to include the payment of the nine-cent-per-pack Missouri cigarette tax in its state sales tax base. *ITT Canteen*, 526 S.W.2d at 13. The cigarette tax statute provided "that the impact of the tax levied hereunder be absorbed by the consumer or user...." *Id.* at 15. The cigarette tax statute further provided the tax "shall thereafter be added to the price of the cigarettes and recovered from the ultimate consumer or user with [the seller] acting as an agent of the state for the payment and collection of the tax to the state." *Id.* In holding the seller was not obligated to include the cigarette tax in its sales tax base, this Court found: (1) the tax was not part of the sales price but was added to the sales price; (2) the tax was a levy on the consumer; (3) the seller acted as a mere tax collection agent on the state's behalf; and (4) by acting as an agent, the seller "had no personal interest in the amounts so received." *Id.* at 17-18. Consequently, because the seller did not receive the tax for its benefit or use, it was not obligated to include the cigarette tax it collected in its sales tax base. *Id.* at 18.

The Rams argue the ELT is akin to the cigarette tax, and they were acting as a tax collection agent for the city, thereby urging this Court to find the city is the ultimate beneficiary of the ELT, not the Rams. This Court disagrees. Unlike the consumers in *Moore* and *ITT Canteen*, the ELT is not a tax on ticket purchasers who seek admission to football games. Rather, the city's ordinance requires the Rams, who are in the business of admitting ticket purchasers who pay an admission charge to view football games, to bear the ELT. The Rams must pay the ELT so they can meet their obligation under the city's ordi-

nance as a condition precedent to receiving the benefit of licensing and conducting business in the city to pass this obligation through to ticket purchasers does not transform the Rams into the city's tax collection agent. Further, the ELT does not contain any of the express language found in the cigarette tax statute, which would designate the Rams as the city's tax collection agent or that the ELT should be levied upon ticket purchasers.

In this case, the sales at retail occurred between the Rams and ticket purchasers who paid a fixed admission price to view football games. Hence, "these are the transactions upon which the gross receipts are based and upon which the sales tax should be calculated." *Cent. Hardware*, 887 S.W.2d at 595. Section 144.010.1(4) provides, for the purposes of the sales tax law, "the total amount of the sale price ... shall be deemed to be the amount received." The Rams received a fixed dollar amount from ticket purchasers seeking admission to football games, which included the ELT. Accordingly, the total amount the Rams received from the ticket purchasers is subject to sales tax and does not constitute a tax upon a tax.

## Conclusion

The Commission erred in finding the Rams did not have to pay sales tax on the ELT they included and collected from ticket purchasers as the amount paid for admission from February 1, 2007, through January 31, 2010, and February 1, 2010, through January 31, 2013. The Commission's decision is reversed, and the cause is remanded.

Fischer, C.J., Wilson, Russell, Breckenridge and Stith JJ., concur. Powell, J., not participating.