

# SUPREME COURT OF MISSOURI
## en banc

KRISPY KREME DOUGHNUT          )
CORPORATION,                   )
                               )
        Appellant,          )
                               )
v.                             )     No. SC95181
                               )
DIRECTOR OF REVENUE,           )
                               )
        Respondent.         )

**PETITION FOR REVIEW OF A DECISION OF THE**
**ADMINISTRATIVE HEARING COMMISSION**
The Honorable Karen A. Winn, Commissioner

*Opinion issued May 3, 2016*

Krispy Kreme Doughnut Corporation petitions for review of the Administrative Hearing Commission's decision ruling that Krispy Kreme is not entitled to a refund of sales tax paid on food items sold from its stores between April 2003 and December 2005. The Commission ruled Krispy Kreme failed to prove, by a preponderance of the evidence, that not more than 80% of its food products were sold for immediate consumption on or off the premises of the establishment; therefore, the lower tax rate authorized by § 144.014[1] did not apply to Krispy Kreme's food sales. Krispy Kreme argues the Commission's decision is contrary to the only evidence in the record and conflicts with the reasonable interpretation of § 144.014.2. Because Krispy Kreme's

---

[1] Statutory citations are to RSMo 2000, unless otherwise indicated.

petition involves the construction of a revenue law of this state, this Court has jurisdiction pursuant to article V, section 3 of the Missouri Constitution. The Commission's decision is affirmed.

## Factual and Procedural History

This Court previously summarized much of the relevant background in *Krispy Kreme Doughnut Corp. v. Dir. of Revenue* (*Krispy Kreme I*), 358 S.W.3d 48 (Mo. banc 2011), a decision that remanded the case to the Commission. After remand and subsequent disposition by the Commission, the case has returned to this Court. The relevant pre-remand background is provided, again, for full context.

Krispy Kreme owns and operates stores in Missouri that are engaged primarily in the production and retail sale of donuts. The stores offer "dine-in" accommodations on their premises and alert potential customers when freshly-made donuts are available with a "HOT DOUGHNUTS NOW" sign. In addition to donuts, the stores sell related food products, such as bagged coffee beans and ground coffee, coffee and related coffee drinks, hot chocolate, milk, bottled water, bottled juices, and other soft drinks. Between April 2003 and December 2005 (the relevant tax periods), Krispy Kreme collected and remitted sales tax from its retail sales based on the 4% rate imposed by § 144.020. However, in 2006, Krispy Kreme took notice of § 144.014, which imposes only a 1% sales tax rate "on all retail sales of food." Subsection 2 of § 144.014 adds further qualifications:

> For the purposes of this section, the term "food" shall include only those products and types of food for which food stamps may be redeemed pursuant to the provisions of the Federal Food Stamp Program as contained

in 7 U.S.C. Section 2012, as that section now reads or as it may be amended hereafter, and shall include food dispensed by or through vending machines. For the purpose of this section, except for vending machine sales, the term "food" shall not include food or drink sold by any establishment where the gross receipts derived from the sale of food prepared by such establishment for immediate consumption on or off the premises of the establishment constitutes more than eighty percent of the total gross receipts of that establishment, regardless of whether such prepared food is consumed on the premises of that establishment, including, but not limited to, sales of food by any restaurant, fast food restaurant, delicatessen, eating house, or cafe.

Arguing the 1% tax rate under § 144.014 was applicable, rather than the 4% tax rate under § 144.020, Krispy Kreme sought a refund for sales tax it had remitted on retail sales of donuts, non-hot beverages, juices, milk, coffee beans, and ground coffee during the relevant tax periods. It did not seek a refund for sales tax remitted on retail sales of hot drinks. Krispy Kreme's original refund claim totaled $324,237.33. The director of revenue denied this claim. After conceding it was not entitled to a refund on dine-in sales, Krispy Kreme reduced its claim to $277,992.20 and sought review of the director's decision by the Administrative Hearing Commission.

Before the Commission, Krispy Kreme argued its products, other than hot drinks, qualified as "food" under § 144.014.2 and that its retail sales were not disqualified from the lower tax rate by § 144.014.2's "80/20 test" because not more than 80% of its gross receipts were derived from "food prepared . . . for immediate consumption." Because most sales were attributable to donuts, whether Krispy Kreme derived more than 80% of its gross receipts from food prepared for immediate consumption depended on the characterization of its donuts. Krispy Kreme argued that, while its donuts were often consumed immediately, not all of its donuts should count toward the 80% threshold

3

because not all were prepared for immediate consumption. It asserted that any or all of the following should not count as food prepared for immediate consumption: (1) donuts that were not purchased within an hour of being prepared and ready to eat; (2) donuts sold by the dozen; and (3) donuts that customers did not eat at the store or in transit. If any of these categories of donuts did not count toward the 80% threshold, Krispy Kreme was not disqualified from § 144.014's lower tax rate by the 80/20 test. The director argued that all of Krispy Kreme's donuts should count as food prepared for immediate consumption because they were all capable of being eaten without further preparation by the customers.

Both sides filed cross-motions for summary decision. The Commission sustained the director's motion for summary decision, overruled Krispy Kreme's motion, and denied Krispy Kreme's refund. The Commission ruled that although Krispy Kreme's products qualified as "food" under the Federal Food Stamp Program's definition, the director's interpretation of § 144.014.2 yielded a more reasonable result when considering the 80/20 test; therefore, Krispy Kreme failed to carry its burden of showing that not more than 80% of its gross receipts were derived from the sale of food prepared for immediate consumption. Krispy Kreme then petitioned for review in this Court.

In *Krispy Kreme I*, this Court rejected both the director's and Krispy Kreme's interpretations and, instead, provided the following interpretation of § 144.014.2:

> The proper interpretation of the 80/20 test becomes apparent when all of the words "food prepared by such establishment for immediate consumption on or off the premises of the establishment" are given their full effect. Of particular importance are the words "on or off the premises," which modify "immediate consumption," clarifying that "immediate consumption" is not

4

an abstract concept (food that *could* be consumed immediately) but a concrete event (actual consumption at the time of purchase or within the time necessary to travel to another location "off the premises"). **Accordingly, "food prepared … for immediate consumption on or off the premises" means all food that is eaten at the place of preparation and purchase, or while traveling to, or immediately upon arrival at another location without any further preparation."**

358 S.W.3d at 53 (emphasis added). This Court held, therefore, neither party was entitled "to a favorable decision based on a correct understanding of the substantive law," reversed the Commission's decision sustaining the director's motion for summary decision, and remanded the case. *Id.* at 53.

Following remand, Krispy Kreme attempted to produce evidence of its customers' actual consumption habits during the relevant tax period. It conducted an online survey between September and November 2012 that asked its customers where they eat the donuts they purchase from a Krispy Kreme store and when they eat such donuts after arriving at the place of consumption. Based on the results, Krispy Kreme concluded that if "immediate consumption" meant consumed within 60 minutes, then enough of its donuts were not immediately consumed for it to be disqualified by the 80/20 test. That is, those donuts that were, in actuality, not consumed within an hour of arriving at the place of consumption were not donuts prepared for immediate consumption and, therefore, did not count toward the 80% threshold.

Understanding that the results of its survey were based on customers' responses in 2012, rather than during the relevant tax periods, Krispy Kreme offered evidence attempting to show the 2012 survey results were equally applicable to the relevant tax periods. Both Alison Holder, the vice president of brand development for Krispy Kreme,

5

and Mike Parker, manager of the Missouri stores, testified that customer behavior had not materially changed from 2003 to 2012; therefore, the survey results also reflected customer behavior during the relevant tax periods. Krispy Kreme also offered several other past surveys tending to show that customers' motivations for purchasing Krispy Kreme donuts had remained largely unchanged over the years. The director did not offer any evidence, but objected to the admission of the 2012 survey.

The Commission again denied Krispy Kreme's refund. The Commission ruled the 2012 survey was admissible, but found the survey did "not establish, by a preponderance of the evidence, that it reflects [Krispy Kreme customers'] consumption habits during the tax periods." The Commission explained that Krispy Kreme's witnesses and other past surveys failed to address the key issue—"when customers eat their doughnuts." The Commission further noted a conundrum it perceived created by this Court's interpretation in *Krispy Kreme I*:

> We recognize that our conclusion raises the question: given the Supreme Court's framing of the issue in this case, how can a retailer prove that not more than 80% of its total gross receipts derives from food prepared by the establishment that is eaten at the place of preparation and purchase, or while traveling to, or immediately upon arrival at, another location without any further preparation? Such a question can never be answered with absolute certainty and precision, so is Krispy Kreme's 2012 survey and testimony linking consumer habits from the survey periods to the tax periods sufficient? Or is it possible that adequate proof for the tax periods at issue simply cannot be found at this point, but a similar survey, made during future tax periods, will suffice for future contemporaneous refund claims?

Krispy Kreme petitioned this Court for review.

6

**Standard of Review**

This Court will affirm the Commission's decision when it is "authorized by law and supported by competent and substantial evidence upon the record as a whole unless clearly contrary to the reasonable expectations of the General Assembly." *801 Skinker Blvd. Corp. v. Dir. of Revenue*, 395 S.W.3d 1, 3–4 (Mo. banc 2013) (internal quotations omitted); *see also* § 621.193. This Court defers to the Commission's findings of fact, but reviews the Commission's determination of issues of law *de novo*. *Michael Jaudes Fitness Edge, Inc. v. Dir. of Revenue*, 248 S.W.3d 606, 608 (Mo. banc 2008).

**Analysis**

Krispy Kreme first argues the Commission erred because its decision was contrary to the only evidence in the record. Krispy Kreme argues it presented substantial evidence of its customers' actual consumption habits that established it was not disqualified from § 144.014's lower tax rate by the 80/20 test. Krispy Kreme concedes that it had the burden of proof and that the usual standard of review—upholding the Commission's decision if "supported by competent and substantial evidence"—is not applicable when reviewing a decision in favor of the party without the burden of proof. *See, e.g., Bakelite Co. v. Miller*, 372 S.W.2d 867, 871–72 (Mo. 1963). That Krispy Kreme had the burden of proof means it had both the burden of production and burden of persuasion. *White v. Dir. of Revenue*, 321 S.W.3d 298, 304 (Mo. banc 2010). The burden of persuasion means Krispy Kreme had "to convince the fact-finder to view the facts in a way that favors" Krispy Kreme. *Id.* at 305. Krispy Kreme did not carry its burden simply by the fact that it offered evidence to support its position and the director offered no evidence. The

7

Commission "may disregard evidence which in its judgment is not credible, even though there is no countervailing evidence to dispute or contradict it." *State ex rel. Rice v. Pub. Serv. Comm'n*, 220 S.W.2d 61, 65 (Mo. banc 1949). "The rule is established in this State that the triers of fact under their duty to weigh the evidence may disbelieve evidence although it is uncontradicted and unimpeached." *Id.* The director needed only to contest Krispy Kreme's evidence, which may be done through cross-examination or pointing out "internal inconsistencies" or credibility issues. *White*, 321 S.W.3d at 308. Because the director contested Krispy Kreme's evidence, this Court defers to the Commission's determinations about persuasiveness of the evidence. *Id.*

Here, the Commission gave little weight to Krispy Kreme's evidence and concluded that Krispy Kreme did not carry its burden of persuasion. Krispy Kreme suggests it offered so much persuasive evidence that this Court must apply a new, and more appropriate, standard of review for this context and ask whether the Commission's decision is "against the weight of the evidence." However, this ignores that "against the weight of the evidence" is already inherently part of this Court's standard of review for administrative cases. *See Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003) ("Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record. An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence."). And this Court will only reverse on an against-the-weight-of-the-evidence basis as a check on "potential abuse of power in weighing the evidence . . . in rare cases, when it has a firm belief that the decree or judgment is

8

wrong." *Ivie v. Smith*, 439 S.W.3d 189, 206 (Mo. banc 2014). As discussed below, this Court has no such belief that the Commission's decision is wrong.

Krispy Kreme secondly argues the Commission erred because its decision is contrary to the reasonable expectations of the General Assembly and conflicts with the reasonable interpretation of § 144.014.2. Krispy Kreme asserts that this Court should reconsider its *Krispy Kreme I* interpretation of the words "food prepared . . . for immediate consumption" and that, by its plain terms, § 144.014.2 is referring only to food that is prepared specifically for consumption at once, without delay, such as a hamburger or steak. Krispy Kreme suggests that, under this proposed interpretation, donuts are not food prepared for immediate consumption because, unlike a restaurant-prepared hamburger or steak, donuts may be consumed after some delay. Echoing the Commission, Krispy Kreme also notes the difficulty of proof seemingly created by *Krispy Kreme I*'s focus on actual consumption.

Concerns over how Krispy Kreme would meet its burden of proof required to obtain the refund are understandable. In an effort to meet its burden of proof in accord, Krispy Kreme attempted to demonstrate when and where its customers ate the donuts they purchased between April 2003 and December 2005. Indeed, by interpreting the language of § 144.014.2 to merely focus on actual consumption, this Court encouraged an effort to determine when and where an establishment's individual customers *actually* consume food that is taken off the establishment's premises. But, borrowing from the Illinois Supreme Court, this Court does not believe the General Assembly "intended that retailers interrogate their customers as to when they plan on eating the food. Indeed, any

9

sort of policing would be impractical and absurd." *Canteen Corp. v. Dep't of Revenue*, 525 N.E.2d 73, 78 (Ill. 1988). Rather, § 144.014.2's terms should be "viewed in the light of reality" and not "be stripped of common sense" or construed "to establish arbitrary loopholes." *Id.* Accordingly, further analysis of the legislative history and legislative intent from this Court appears necessary.

Subsection 1 of § 144.014 provides that "the tax levied and imposed . . . on all retail sales of food shall be at the rate of one percent." Subsection 2 further defines what is meant by "food." As originally enacted, subsection 2 of § 144.014 read only:

> For the purposes of this section, the term "food" shall include only those products and types of food for which food stamps may be redeemed pursuant to the provisions of the Federal Food Stamp Program as contained in 7 U.S.C. Section 2012, as that section now reads or as it may be amended hereafter, and shall include food dispensed by or through vending machines.

RSMo Supp. 1997. In relevant part, the definition of "food" for purposes of the Federal Food Stamp Program is "any food or food product for home consumption except . . . hot foods or hot food products ready for immediate consumption." 7 U.S.C. § 2012(k)(1). Accordingly, "food" under § 144.014 meant that which was for home consumption, unless it was hot and ready for immediate consumption. At first glance, this definition would appear to, for tax purposes, distinguish food purchased from grocery stores and establishments similar to grocery stores (i.e., food for home consumption) from food purchased from restaurants and establishments similar to restaurants[2] (i.e., food that was

---

[2] Hereinafter, the term "grocery stores" will be used broadly to refer to both grocery stores and establishments similar to grocery stores, such as convenience stores. Likewise, the term

10

either not for home consumption or was hot and ready for immediate consumption). After all, the higher tax rate in § 144.020 explicitly applies to "meals and drinks furnished at any . . . restaurant, eating house . . . or other place in which . . . meals or drinks are regularly served to the public." Consequently, food purchased from grocery stores would, for the most part, be taxed at the 1% rate in § 144.014, while food purchased from restaurants would be taxed at the higher rate in § 144.020.

Instead of accomplishing this intended distinction, the definition of "food" created a tax anomaly, allowing many foods sold by restaurants to be taxable at the 1% rate largely intended for foods sold by grocery stores. This is because the tax rate applicable to food purchased from a restaurant could very much depend on what food was ordered and how it was ordered. If a customer purchased food from a restaurant to go or for home delivery, the food was presumably for home consumption. Whether or not such food was "food" for purposes of § 144.014 and its lower tax rate turned solely on whether the food was hot. If hot, the food was not "food" for purposes of § 144.014 and taxed at the higher rate; if not hot, the food was "food" for purposes of § 144.014 and taxable at the lower rate. For example, a cold deli sandwich ordered to-go or for home delivery would, under the dictates of § 144.014, be taxable at a lower rate than a hot deli sandwich ordered to go or for home delivery from the same establishment. Moreover, if a customer ordered a non-hot food item, whether or not it was "food" for purposes of § 144.014 turned solely on where the food was to be consumed. For example, if a cold deli

_____

"restaurants" will be used broadly to refer to both restaurants and establishments similar to restaurants, such as delicatessens and cafes.

11

sandwich was ordered to go or for home delivery, the sandwich would be "food" for purposes of § 144.014 and taxable at the lower rate; if the same cold deli sandwich was ordered for "dine-in" from the same establishment, the sandwich would not be "food" for purposes of § 144.014 because it would not be for home consumption.  In short, unintended inconsistencies could abound due to the limited definition of "food" incorporated by § 144.014.2.

Accordingly, just two years after adopting § 144.014, the General Assembly added the following to subsection 2:

> For the purpose of this section, except for vending machine sales, the term "food" shall not include food or drink sold by any establishment where the gross receipts derived from the sale of food prepared by such establishment for immediate consumption on or off the premises of the establishment constitutes more than eighty percent of the total gross receipts of that establishment, regardless of whether such prepared food is consumed on the premises of that establishment, including, but not limited to, sales of food by any restaurant, fast food restaurant, delicatessen, eating house, or cafe.

RSMo Supp. 1999.  With this addition, food sold by grocery stores is much more effectively distinguished from food sold by restaurants for tax purposes.  Because of the 80/20 test, *all* food sales from restaurants are now disqualified from § 144.014's lower tax rate—not just food that is ordered for dine-in or hot and ready for immediate consumption.  That this was the intended effect is confirmed, most obviously, by the addition's last line emphasizing that the 80/20 test is meant to capture "sales of food by any restaurant, fast food restaurant, delicatessen, eating house, or cafe."

Of course, this attempted distinction between grocery stores and restaurants can only be accomplished if the establishments intended to fail the 80/20 test do indeed

12

derive more than 80% of gross receipts from the sale of food prepared for immediate consumption. Key language found in the addition to subsection 2 ensures that this 80% threshold will be met by the intended targets. First, the addition refers to "food prepared by such establishment for immediate consumption," without reference to whether such food is hot, as the Federal Food Stamp Program does. § 144.014.2. This dispels any notion that food previously qualifying for the lower tax rate as non-hot food is not intended to count toward the 80% threshold. It does not matter whether the food that is prepared for immediate consumption is hot, cold, or room temperature—it all counts toward the 80% threshold. Second, the addition refers to "food prepared by such establishment for immediate consumption **on or off the premises of the establishment**." § 144.014.2 (emphasis added). This "on or off the premises" language dispels any notion that food previously qualifying for the lower tax rate as food for home consumption is not intended to count toward the 80% threshold. It does not matter whether the food that is prepared for immediate consumption is for a dine-in order, a to-go order, or a delivery order—it all counts toward the 80% threshold.

"This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009). As demonstrated above, because the addition to subsection 2 does not limit itself to "hot" food and because it expressly includes the words "on or off the premises," the general purpose of the addition to subsection 2 is readily apparent—ensuring that food sold by restaurants is no longer taxable at § 144.014's lower rate. With this purpose in mind, there is no need to place

13

undue emphasis on certain terms of § 144.014.2. Because the 80/20 test was intended to capture restaurants by counting food prepared for immediate consumption toward the 80% threshold, the pertinent question in determining whether an establishment's food should count toward the 80% threshold is whether the food is akin to the food primarily sold by "restaurant[s], fast food restaurant[s], delicatessen[s], eating house[s], [and] cafe[s]." *See* § 144.014.2. In contrast to grocery stores, restaurants primarily sell foods that they have prepared and that are often, though not always, consumed immediately. Accordingly, in keeping with the plain language of § 144.014.2 and the intent of the General Assembly, if food is prepared by an establishment and regularly consumed by the establishment's customers immediately—that is, "at the place of preparation and purchase, or while traveling to, or immediately upon arrival at another location without any further preparation"—it is "food prepared . . . for immediate consumption" for purposes of § 144.014.2.[3] *See Krispy Kreme I*, 358 S.W.3d at 53.

Notably, in *Krispy Kreme I*, this Court rejected the argument that "food prepared for . . . immediate consumption" meant food that was merely capable of being immediately consumed. *Id.* at 52. A food that is capable of immediate consumption is not necessarily a food that is indeed regularly consumed immediately. A loaf of bread, for example, is certainly food capable of being immediately consumed, but is not one

---

[3] Krispy Kreme's argument that only foods prepared specifically for consumption at once, without delay, are intended to count toward the 80% threshold is belied by the fact that § 144.014.2 does not refer only to "hot food" that is ready for immediate consumption, as the Federal Food Stamp Program does. Rather, it refers broadly to all food prepared for immediate consumption, without reference to temperature that could affect when the food should be consumed. *See* § 144.014.2.

14

regularly consumed immediately. Restaurants typically sell foods that are not just capable of immediate consumption, but are, in actuality, regularly consumed immediately—such as sandwiches, hamburgers, and salads. Merely focusing on capability of immediate consumption is an incomplete analysis as it does not fully reach the essence of what restaurants primarily sell. If a food is not one that is regularly consumed immediately, it is not a food typically sold by restaurants and is not intended to count toward the 80% threshold.

In this limited sense, customers' actual consumption habits matter. *See id.* at 53. However, the classification of a food does not change based on an individual's actual consumption of that food. If a food qualifies as a "food prepared . . . for immediate consumption" based on the above criteria, all sales of that food count toward the 80% threshold regardless of whether a particular customer actually consumes the food immediately. *Krispy Kreme I*'s emphasis on actual consumption should not be read to authorize otherwise. Furthermore, whether a food meets the above criteria often would be readily apparent by the surrounding circumstances indicating the general nature of the food, with actual or survey evidence of customer consumption optional.

Krispy Kreme's case is illustrative of this point. Here, Krispy Kreme sells donuts that it has fully prepared for consumption. Krispy Kreme's donuts may be eaten without delay and without further preparation on the part of the customers and are, by their very nature, portioned into individual servings, even when sold by the dozen. Krispy Kreme's donuts are typically a stand-alone snack or meal, rather than food that is purchased to be used in conjunction with other foods to create an entirely different meal. Krispy Kreme

15

offers dine-in seating for the consumption of donuts and also sells drinks, such as coffee and milk, that lose their appeal if not consumed immediately and are complementary of donut consumption. Furthermore, Krispy Kreme alerts potential customers when freshly-made donuts are available with a "HOT DOUGHNUTS NOW" sign, the inference being that many customers prefer to consume donuts that have just been made. Given these circumstances, Krispy Kreme does not dispute—and its own statistical evidence confirms—that it prepares its donuts and that the donuts are regularly consumed immediately by its customers. Therefore, Krispy Kreme's donuts are akin to food sold by restaurants and count toward the 80% threshold as "food prepared . . . for immediate consumption."

This is true even for the donuts that are not actually consumed immediately. Statistical evidence about individual consumption showing that some donuts are not *actually* consumed immediately does not change the general nature of Krispy Kreme's donuts. Simply put, a donut is a donut. Krispy Kreme does not prepare certain donuts suitable only for immediate consumption and separate, different donuts that are also suitable for non-immediate consumption. All donuts are prepared the same in this respect, and all donuts, in general, are regularly consumed immediately by its customers. A donut is no less a food prepared for immediate consumption simply because a customer chooses to eat it two hours after purchase rather than right away.

As seen in this case, to hold otherwise encourages the hopeless endeavor of trying to prove individual customers' actual consumption habits after they leave an establishment's premises. More importantly though, to hold otherwise provides a

16

potential arbitrary loophole for the type of establishments that the General Assembly was trying to preclude from the benefits of a lower tax rate provided by § 144.014. In short, Krispy Kreme's stores operate more like restaurants than grocery stores. They are best described as places in which "meals or drinks are regularly served to the public," and its sales are intended to be taxed at the higher rate under § 144.020. As the type of establishment intended to be disqualified from the lower rate by the 80/20 test, Krispy Kreme has failed to meet the burden of proof to be entitled to a sales tax refund pursuant to interpretation of § 144.014.2. Giving effect to the General Assembly's intent and the plain language of § 144.014.2, all of Krispy Kreme's donuts are "food prepared . . . for immediate consumption."

The Commission's decision denying Krispy Kreme a refund under § 144.014 is consistent with the reasonable expectations of the General Assembly and authorized by law. After review of the record, this Court concludes Krispy Kreme failed to prove that sales of food prepared for immediate consumption did not constitute more than 80% of its total gross receipts and failed to show it was entitled to the lower tax rate under § 144.014. The Commission's decision is affirmed.

Zel M. Fischer, Judge

All concur.

17