

# SUPREME COURT OF MISSOURI
## en banc

SEBA, LLC,                              )    *Opinion issued November 24, 2020*
                                        )
            Appellant,                  )
                                        )
v.                                      )    No. SC98601
                                        )
DIRECTOR OF REVENUE,                    )
                                        )
            Respondent.                 )

**PETITION FOR REVIEW OF A DECISION OF THE**
**ADMINSTRATIVE HEARING COMMISSION**
The Honorable Renee T. Slusher, Commissioner

The Administrative Hearing Commission (hereinafter, "the AHC") determined SEBA, LLC (hereinafter, "SEBA"), doing business as Eddie's Southtown Donuts (hereinafter, "Eddie's"), was liable for unpaid state sales tax, statutory interest, and a 5 percent addition to tax owed as assessed by the director of revenue (hereinafter, "the director"), from October 1, 2011, through September 20, 2014. SEBA seeks judicial review of the AHC's decision. This Court has jurisdiction pursuant to article V, section 3 of the Missouri Constitution.[1] The AHC's decision is affirmed.

---

[1] The Missouri Court of Appeals, Western District, ordered transfer of this case to this Court pursuant to article V, section 11 because this case involves the construction of the revenue laws of this state over which this Court has exclusive jurisdiction pursuant to article V, section 3.

## Factual and Procedural History

In 2007, Brad Arteaga (hereinafter, "Arteaga") and Eddie Strickland (hereinafter, "Strickland") formed SEBA to facilitate the opening of Eddie's, a donut shop located in the City of St. Louis. Arteaga purchased the building for their business, procured all of the donut shop's equipment, and handled the financial responsibilities. Strickland was Eddie's sole, paid employee who was responsible for all of the shop's day-to-day operations, including making the donuts by hand, selling donuts, ordering supplies, and delivering wholesale orders to customers. Eddie's was open from 5 a.m. to noon, seven days a week to sell donuts, coffee, and other drinks.

Initially, Eddie's clientele consisted exclusively of walk-in customers purchasing donuts and coffee. Retail customers could pay with cash or a credit card. Eddie's had a used cash register with a single tape that produced a single receipt. The receipt did not indicate whether the customer paid with cash or a credit card. Neither the cash register nor SEBA had a secondary method, such as a Z-tape, to track retail sales.[2] Strickland either gave the customer the receipt or threw it away. Arteaga knew nothing about using a Z-tape or "double receipts" to track sales. The credit card machine did not record individual transactions; instead, it produced a single batch receipt at the end of the day indicating total sales. Strickland wrapped this receipt around the cash received for Arteaga to deposit.

As walk-in business declined, Arteaga procured several wholesale customers, which he estimated comprised approximately 80 percent of Eddie's business. Wholesale orders

---

[2] Z-tapes are "tapes printed from a cash register that summarize[] the day's sales[.]" *United States v. Koudanis*, 207 F. Supp. 3d 115, 121 (D. Mass. 2016).

were paid for by check or credit card. Arteaga kept copies of wholesale customer invoices, tax exemption certificates, and tax exempt letters in a metal desk in an adjoining room to Eddie's.

Joseph Otten ("hereinafter, "Otten") was Arteaga's accountant who prepared SEBA's tax returns, sales tax reports, and payroll reports. Arteaga provided Otten with paycheck stubs, bank statements, and credit card statements to prepare SEBA's sales tax returns. Otten recommended his clients keep Z-tapes and acknowledged not all clients provided him with bank statements to prepare the sales tax returns because they provided actual sales numbers or Z-tapes. Otten reviewed the bank and credit card statements with Arteaga. Arteaga determined which sales were wholesale compared with retail by assuming the high-dollar deposits were wholesale and the low-dollar deposits were retail.

The director initiated an audit of SEBA's tax records for October 1, 2011, through September 30, 2014. Because the auditor assigned to perform the audit had been in that capacity for two months and still was undergoing training, the auditor's supervisor assisted with the audit. The auditor requested several documents for the audit period, but SEBA produced only limited, incomplete documents. The auditor informed SEBA of its statutory responsibility to retain all business operation records and listed specific documents to retain. Because the audit period records were incomplete, the auditor requested SEBA retain individual cash register receipts for December 2014, along with the beginning and ending inventory of donuts made for the month. SEBA provided limited receipts for the month. The auditor next requested records for April 2015 through June 2015, but SEBA did not retain or produce the requested records.

3

The auditor then requested sales documents for July 2015. SEBA presented the auditor with a notebook Strickland prepared containing handwritten entries of the reported number of donuts sold for wholesale, retail, and discarded as waste. SEBA provided its credit card batch totals, cash register transaction receipts for retail sales, credit card receipts, and a calculation tape tracking retail sales for the month. SEBA also provided some exemption letters and other documentation to verify wholesale customers.

The auditor found SEBA's July 2015 records unreliable because they contained several discrepancies. Because of these discrepancies, the auditor estimated SEBA's July 2015 retail sales and then used this amount to estimate its retail sales during the audit period.[3] The auditor determined SEBA's estimated gross sales for July 2015 totaled $16,892.42. The auditor then calculated a cash-to-credit sales ratio for July 2015. The auditor determined that 28 percent of SEBA's total sales were credit card sales and 72 percent of its total sales were cash sales. The auditor applied these ratios to the known credit card sales to estimate gross sales for the audit period. The auditor subtracted exempt sales for the entities to which SEBA provided valid exemption certificates, which did not include all of SEBA's wholesale customers.

---

[3] The auditor did not dispute the number of donuts made and sold at wholesale because these sales were documented by check or credit card payments, which were verified by SEBA's bank statements. The auditor did take issue, however, with SEBA's records indicating it sold 1,045 dozen wholesale donuts for July 2015, with an average price of $5.35 per dozen, that totaled $5,590.75 in wholesale sales because the checks and credit card payments totaled only $4,356.49.

4

The auditor concluded SEBA underreported its taxable sales in the amount of $400,483.72 during the audit period. The auditor determined SEBA failed to pay $23,431.89 in sales tax based on the underreported taxable sales. The auditor imposed a 5 percent addition to tax because SEBA "displayed intentional disregard and negligence by failing to double check [its] sales tax figures to verify they were accurate." The auditor's supervisor agreed with imposing the addition to tax. The department of revenue (hereinafter, "the department") assessed SEBA with a total liability of $38,540.44, which included $34,313.87 in underpaid taxes, $1,715.70 as the 5 percent addition to the tax, and $2,510.87 in statutory interest.

SEBA filed a petition for review with the AHC challenging perceived flaws in the auditor's methodology and seeking to establish additional tax exempt sales. The AHC held an evidentiary hearing at which Arteaga, Otten, and the auditor testified. SEBA did not offer the notebook into evidence because Arteaga testified that, after the audit, he could not recall where he stored it. Arteaga also explained several requested records for the audit period were discarded when the metal desk was removed by a tenant who leased space in the building Eddie's occupied.

The AHC determined SEBA was liable for unpaid sales tax in the amount of $38,540.44, minus the sales tax assessed on $26,567.57 in income generated from SEBA's exempt sales to three organizations the auditor initially included. The AHC found SEBA liable for statutory interest and determined the 5 percent addition to tax was appropriate because SEBA was negligent in reporting its taxable sales because it failed to keep adequate, accurate records. SEBA seeks judicial review of the AHC's decision.

## Standard of Review

"This Court will affirm the [AHC]'s decision when it is authorized by law and supported by competent and substantial evidence upon the record as a whole unless clearly contrary to the reasonable expectations of the General Assembly." *St. Louis Rams LLC v. Dir. of Revenue*, 526 S.W.3d 124, 126 (Mo. banc 2017) (quoting *Krispy Kreme Doughnut Corp. v. Dir. of Revenue*, 488 S.W.3d 62, 67 (Mo. banc 2016)) (internal quotation omitted); *see also* section 621.193, RSMo 2016.[4] The AHC "may disregard evidence which in its judgment is not credible, even though there is no countervailing evidence to dispute or contradict it." *Krispy Kreme*, 488 S.W.3d at 67 (Mo. banc 2016) (quoting *State ex rel. Rice v. Pub. Serv. Comm'n*, 220 S.W.2d 61, 65 (Mo. 1949)). "The rule is established in this [s]tate that the triers of fact under their duty to weigh the evidence may disbelieve evidence although it is uncontradicted and unimpeached." *Id*. at 67-68.

## Total Taxable Retail Sales

SEBA argues the AHC erred in affirming the auditor's calculation of total taxable sales during the audit period and finding it was liable for $34,313.87 in additional sales tax because its ruling was based on speculation and conjecture and was unsupported by competent and substantial evidence on the whole record. SEBA argues the auditor's methodology and findings concerning Eddie's average retail sales for July 2015, its cash-to-credit ratio, and total retail sales were based on speculation and conjecture. SEBA

---

[4] All statutory references are to RSMo 2016 unless otherwise noted.

asserts these findings were not supported by SEBA's business records and Arteaga's testimony, which would compel a different result.

*Burden of Proof*

Prior to addressing the merits of SEBA's multifarious point, this Court must discuss the burden of proof, which influences this Court's analysis. SEBA argues the director bears the burden of demonstrating SEBA's tax liability, while the director contends the burden of proof shifted to SEBA due to its inadequate recordkeeping.

Section 144.020.1 imposes a sales tax on "all sellers … engaging in the business of selling tangible personal property or rendering taxable service at retail in this state." Section 144.021.1 requires all sellers of tangible personal property to report their gross receipts and remit sales tax on those receipts. Section 144.320 requires all businesses to keep books and records required by the federal tax code for federal income tax purposes. These books and records shall be subject to inspection by the director and preserved for a period of at least three years. *Id.* With respect to determining tax liability, section 136.300.1 states:

> With respect to any issue relevant to ascertaining the tax liability of a taxpayer all laws of the state imposing a tax shall be strictly construed against the taxing authority in favor of the taxpayer. The director … shall have the burden of proof with respect to any factual issue relevant to ascertaining the liability of a taxpayer only if:
>
> > (1) The taxpayer has produced evidence that establishes that there is a reasonable dispute with respect to the issue; and
> >
> > (2) The taxpayer has adequate records of its transactions and provides the department … reasonable access to these records.

SEBA contends, because section 144.320 does not prescribe any specific form of recordkeeping, it was not required to maintain Z-tapes to comply with the statute. Accordingly, SEBA argues the auditor's dissatisfaction with its recordkeeping method or business documents is not a license for the auditor to disregard the records SEBA provided during the audit.

While SEBA correctly notes section 144.320 does not prescribe a particular form of recordkeeping, SEBA's failure to maintain adequate records extends far beyond not maintaining Z-tapes or failing to use any other method of tracking retail sales. SEBA disregarded its failure to maintain adequate records of its sales during the audit period, after the auditor sent correspondence to SEBA reminding it of its statutory obligation to maintain records going forward, or for any of the requested periods during the audit. For the audit period, SEBA failed to maintain or provide individual retail sales receipts or records to verify its bank statements. The cash register printed only a single receipt and did not utilize Z-tapes or any other secondary method to track retail sales. The cash register receipts were either given to the customer or thrown away. SEBA failed to track inventory numbers for donuts and drinks sold. The auditor gave SEBA several opportunities to provide records after the audit was initiated, including maintaining sales records for December 2014, and April 2015 through June 2015. Despite the auditor's request, SEBA provided only two days' of receipts for the December 2014 period and did not retain records for the April 2015 through June 2015 period. Moreover, the AHC found Arteaga did not have a credible explanation about the metal desk's disposal, which allegedly contained SEBA's financial documents and exemption certificates. The AHC also questioned whether SEBA ever

8

retained its wholesale records in the desk in light of Arteaga's testimony he assumed high dollar deposits were wholesale sales and low dollar deposits were retail sales. Hence, this Court finds the record amply demonstrates SEBA did not maintain adequate records of its transactions. Accordingly, SEBA had the burden of proof with respect to any factual issue relevant to ascertaining its liability pursuant to section 136.300.1(2).

*Estimate-Based Assessment*

SEBA takes issue with the auditor's methodology for determining its total taxable sales because it believes the auditor's findings were based on speculation and conjecture. SEBA points to isolated testimony in which the auditor stated her conclusions were based on "possibilities" and the AHC's acknowledgement the auditor's calculations "contained some speculation."

Section 144.250.4 provides in pertinent part,

[I]f a person neglects or refuses to make a return and payment as required by sections 144.010 to 144.525, the director … shall make an estimate based upon any information in his [or her] possession or that may come into his [or her] possession of the amount of the gross receipts of the delinquent for the period in respect to which he [or she] failed to make return and payment, and upon the basis of said estimated amount compute and assess the tax payable by the delinquent; such estimate may be reconstructed for that period of time for which the tax may be collected as prescribed by law.

In this case, the auditor had no choice but to estimate SEBA's gross receipts pursuant to section 144.250.4 based on the information she possessed at the time of the audit because SEBA wholly failed to maintain any records during the audit period. The auditor requested multiple documents from the audit period, including federal, sales, use, and withholding tax returns and supporting schedules, general ledgers, depreciation schedules, sales

9

journals, sales invoices, sales tax-exemption certificates and letters, purchase invoices, payroll registers, W-2s, 1099-K forms, and bank statements. SEBA provided federal income tax returns, depreciation schedules, bank statements, some 1099-K forms, some purchase invoices, payroll registers, W-2s, and a general ledger; however, even these provided records were incomplete.

Even after the auditor informed SEBA to maintain appropriate books and records and included a list of specific records to maintain, SEBA failed to maintain its records for three subsequent periods to aid the auditor in making an estimate. The auditor testified she had assistance from her supervisor in performing the audit and spoke with her supervisor before making certain assumptions to determine whether they met auditing principles, which her supervisor confirmed. With respect to isolated portions of the transcript, the auditor explained discrepancies between her figures and the handwritten notebook were "possible" because not all of the dozens of donuts sold were recorded based on the records provided. The AHC agreed the auditor lacked "credible data to estimate SEBA's taxable sales" based upon the data SEBA provided. The AHC's full finding regarding the auditor's calculation stated, "[T]here is some speculation in the auditor's calculations; however, this is the nature of having to estimate taxes when a taxpayer lacks supporting documentation." Given the paucity of records SEBA maintained and provided, the auditor necessarily had to estimate SEBA's gross receipts pursuant to section 144.250.4. *See Dick Proctor Imports, Inc. v. Dir. of Revenue*, 746 S.W.2d 571, 575 (Mo. banc 1988) (holding the AHC "shall make as close an approximation as it can" when the precise amount of the taxpayer's sales cannot be determined).

10

*Average Retail Sale*

SEBA challenges the auditor's methodology and findings concerning Eddie's average retail sales for July 2015 because it believes the findings were based on speculation and conjecture rather than on SEBA's business records. SEBA states the AHC's decision adopting the auditor's finding Eddie's average retail sale was $8.06 misapplied section 536.070(8)[5] because the AHC was required to consider Arteaga's testimony and the notebook entries. SEBA's arguments ignore its burden of proof and disregards the AHC afforded Arteaga's testimony limited weight because he lacked credibility at times and his testimony was inconsistent with other evidence in the record. When examining the record as a whole, this Court finds the auditor's determination was supported by competent and substantial evidence.

The record reflected a single donut cost 75 cents and a dozen donuts cost $8 at retail. Arteaga testified the average walk-in customer bought a few donuts and a cup of coffee resulting in an average retail sale of $3.00. Arteaga testified it was rare to sell dozens of donuts to a single customer during the week. SEBA provided the auditor with 490 cash register receipts documenting $3,950.23 in retail sales for July 2015 and the notebook that recorded the number of donuts sold for wholesale, retail, and discarded as waste. The notebook indicated Eddie's made 768 dozen donuts for retail, sold 349.5 dozen donuts, and

---

[5] Section 536.070(8) states, "Any evidence received without objection which has probative value shall be considered by the agency along with the other evidence in the case."

11

wasted 418.4 dozen donuts.[6] At a price of $8.00 per dozen and 75 cents per donut, July 2015 sales should have been between $2,796.80 and $3,146.40, but SEBA's records indicated retail sales of $3,950.23, revealing a discrepancy in SEBA's accounting. Arteaga could not explain this discrepancy. The auditor also found the notebook recorded only donut sales and did not track sales of donut holes. Arteaga denied Eddie's sold donut holes, stating they were offered to customers as samples. The AHC found this testimony not credible because there was a photograph depicting large numbers of donut holes in the retail case as if offered for sale and invoices to a wholesale customer listing donut hole sales.

The auditor also examined the 490 cash register receipts SEBA provided. Each sales receipt had a transaction number. The first receipt provided was dated July 2, 2015,[7] and was numbered 1512, and the last receipt provided for July 31, 2015, was numbered 3066. Accordingly, the auditor concluded SEBA should have provided 1,555 receipts given the transactions numbers; yet, it only provided 490 receipts. Arteaga explained the discrepancy was due to Strickland printing duplicate receipts for customers who requested them. The auditor did not find this explanation accurate as more than two-thirds of the receipts were missing, and the AHC adopted this finding. The calculation tape SEBA provided was inconsistent with the receipts provided, and Arteaga could not explain the

---

[6] Arteaga testified the unsold donuts were donated to local food pantries at the close of business each day. The AHC found it was not credible that Eddie's was discarding more donuts than it sold.

[7] There were no receipts provided for July 1, 2015, and no evidence in the record that Eddie's was closed that day.

discrepancy. Hence, while the auditor found SEBA's July 2015 sales records corresponded with its bank records, the auditor determined Arteaga was not depositing all of the cash into SEBA's bank account due to the unaccounted-for receipts.

Due to these discrepancies, the auditor estimated SEBA's July 2015 retail sales and used this estimated amount to calculate its sales during the audit period. To estimate SEBA's retail sales, the auditor determined SEBA's average retail sales price by dividing SEBA's documented retail sales of $3,950.23 by the 490 receipts received for an average retail sales price of $8.06. The auditor then multiplied the average receipt total ($8.06) by the difference in transaction numbers on the receipts (1,555) for a total of $12,535.93 in retail sales.[8] After adding together the estimated cash total and the wholesale orders[9] paid by check and credit card, the auditor determined SEBA's estimated gross sales for July 2015 totaled $16,892.42. While this number may not reflect Eddie's actual gross sales for July 2015, SEBA could have avoided this estimate by retaining and providing complete, accurate data to the auditor.

SEBA faults the auditor for failing to analyze the individual sales receipts to determine whether the daily retail sales figures were consistent. SEBA does not explain how this analysis would yield a different result. SEBA also faults the auditor for failing to

---

[8] The AHC noted the precise calculation was $12,533.30, but accepted the auditor's figure for the purpose of its decision.

[9] SEBA's records indicated it sold 1,045 dozen wholesale donuts for July 2015 with an average price of $5.35 per dozen, totaling $5,590.75 in wholesale sales. Yet, the checks and credit card payments SEBA submitted totaled only $4,356.49. SEBA offered no explanation for this discrepancy.

separate cash receipts from credit card receipts. Because the auditor included both types of transactions, SEBA believes this resulted in a higher average retail sale figure since credit card receipts were likely to include higher sales amounts. SEBA claims the auditor should have calculated the average retail sale in a more certain manner by determining which of the 490 receipts represented cash sales, totaling them, and dividing that figure by the number of cash sales receipts. Although SEBA's counsel posited this alternative methodology while questioning the auditor, she replied she did not know if that methodology was appropriate because she did not receive all of the receipts. SEBA never presented any evidence demonstrating what this methodology would yield as the average retail sale in contrast with the auditor's calculation. The only evidence SEBA presented regarding Eddie's average retail sale was Arteaga's testimony stating it was $3.00. Because the average retail price was a disputed issue, the AHC was free to disbelieve Arteaga's testimony, which it found not credible at times because it conflicted with the evidence in the record.

Further, SEBA argues the auditor wrongly assumed a cash purchase occurred every time a transaction was recorded. Again, SEBA's argument disregards its burden of proof. Because SEBA failed to maintain adequate records, it bore the burden of bringing forth evidence to refute the auditor's findings. SEBA presented no credible evidence to explain why two-thirds of the receipts were unaccounted for, if they could be sorted by cash or credit transactions, and why transactions recorded did not equate to purchases made. The AHC appropriately adopted the auditor's methodology in calculating SEBA's average retail sales.

14

*Cash-to-Credit Ratio*

SEBA also contests the auditor's calculation of its cash-to-credit ratio. The auditor took the combined retail and wholesale credit card payment per batch total and divided it by the total estimated sales, from which she determined that 28 percent of SEBA's total sales were credit card sales. The auditor then took the estimated cash payments and divided them by the total estimated sales to determine SEBA's cash sales constituted 72 percent of its total sales. The AHC found this calculation was appropriate.

SEBA contends, however, the auditor should have asked Arteaga to identify which of the 490 receipts represented cash sales and which represented credit sales, which would have eliminated the need for the auditor to calculate her own ratio. The auditor was not bound to accept SEBA's inaccurate, incomplete, and inconsistent records at face value. SEBA again cites section 537.070(8) as grounds for invalidating the AHC's adoption of the auditor's cash-to-credit ratio determination because it believes the AHC disregarded Arteaga's uncontradicted testimony that SEBA's cash-to-credit ratio was 40 percent cash sales and 60 percent credit sales and that approximately 80 percent of Eddie's business was comprised of wholesale orders. However, the AHC questioned whether SEBA ever retained its wholesale records in the metal desk in light of Arteaga's testimony he assumed high dollar deposits were wholesale sales and low dollar deposits were retail sales. Moreover, even SEBA's own records contradicted Arteaga's testimony regarding the 80 percent estimate of wholesale business. The AHC was free to disbelieve Arteaga's testimony on this issue.

15

SEBA did not meet its burden to prove the director's assessment failed to comply with the law. The AHC's adoption of the auditor's calculation of SEBA's total taxable sales is supported by competent and substantial evidence on the record. This point is denied.

## Exempt Sales

SEBA argues the AHC erred in ruling it failed to prove its wholesale sales to St. John the Baptist Church and St. Patrick Center were exempt from taxation under section 144.210.1. SEBA argues this ruling was unauthorized by law and unsupported by competent and substantial evidence on the whole record. SEBA further argues it was unnecessary for it to offer certain documents into evidence at the hearing because the AHC was permitted to take judicial notice of them.

*Burden of Proof*

Section 144.210.1 places the burden of proof on the taxpayer to demonstrate a sale was not a sale at retail because it was exempt. Section 144.210.1 also requires the taxpayer to "obtain and maintain exemption certificates signed by the purchaser or his agent as evidence for any exempt sales claimed." The taxpayer also "may prove [a] sale is exempt from tax under this chapter in accordance with proof admissible under the applicable rules of evidence." *Id.* Tax exemptions are construed strictly against the taxpayer, and any doubt must be resolved in favor of application of the tax. *DI Supply I, LLC v. Dir. of Revenue*, 601 S.W.3d 195, 196 (Mo. banc 2020). "An exemption is allowed only upon clear and unequivocal proof, and any doubts are resolved against the party claiming it." *Bartlett Int'l, Inc. v. Dir. of Revenue*, 487 S.W.3d 470, 472 (Mo. banc 2016).

16

*Competent Evidence of Tax Exemption*

SEBA argues the AHC's ruling excluding exemptions for its wholesale sales to St. John the Baptist Church and St. Patrick Center was unauthorized by law and unsupported by competent and substantial evidence on the whole record. SEBA claims the AHC ignored letters the department issued to the Archdiocese of St. Louis (hereinafter, "Archdiocese") concerning exempt status for these entities, which SEBA offered at the hearing without objection.

On July 11, 2002, the department issued a letter to the Archdiocese approving its application for sales tax exempt status. On October 16, 2008, the department issued another letter to the Archdiocese confirming that the organizations listed in the Official Catholic Directory (hereinafter, "the directory") are Archdiocese agencies and instrumentalities permitted to use the July 2002 tax exempt letter. The letter stated the Archdiocese was required to furnish the department with a current copy of the directory to ensure the department had updated records of the agencies and instrumentalities using the exemption letter. The Archdiocese issued a letter to its parishes, offices, and agencies on December 12, 2008, stating the department suggested, when using the July 2002 exemption letter, it should be accompanied by the October 2008 letter, a dated directory cover page, and the appropriate directory page listing the organization.

SEBA referenced the directory at the hearing and asserted it believed the directory identified St. John the Baptist Church and St. Patrick Center as entities affiliated with the Archdiocese. SEBA did not offer the directory into evidence at the hearing, SEBA did not request the AHC take judicial notice of the directory, and it was not included in the legal

17

file on appeal. Because SEBA failed to provide the directory, the AHC found there was no evidence in the record St. John the Baptist Church and St. Patrick Center were part of the Archdiocese and SEBA's sales to them were not tax exempt. The AHC further found the auditor's testimony she had no reason to doubt these entities were tax exempt did not constitute proof of the fact, and the AHC could not make such a finding based solely on the entities' names.

SEBA argues the AHC ignored the language in the Archdiocese December 2008 letter that the department suggested—but did not require—the directory to accompany the department's July 2002 exemption letter to prove an exempt sale. SEBA further argues the director did not offer any evidence refuting the October 2008 letter's assertion the Archdiocese shall provide the department with a copy of the directory nor did the auditor take any steps to locate the directory to determine if these entities were exempt. Because the letters were entered into evidence without objection and were unrefuted, SEBA also maintains the AHC could not disregard this undisputed evidence without finding it was not credible.

SEBA's arguments are unpersuasive. The Archdiocese's characterization of the director's "suggestion" is not a binding admission or directive from the director. The October 2008 letter explicitly cautions the Archdiocese that the letter was for informational purposes only and was not a binding letter ruling. Hence, the Archdiocese's instructions have no binding effect on the department or the AHC. Further, SEBA's argument the director failed to refute its assertion that the department had an updated copy of the directory and the auditor took no steps to consult the directory ignores the burden of proof.

18

Section 144.210.1 explicitly required SEBA to demonstrate the sales to St. John the Baptist Church and St. Patrick Center were exempt and required SEBA to obtain and maintain the tax exemption certificates. SEBA failed to offer such proof or maintain such records and, therefore, did not carry its burden of proof. Even assuming the AHC was compelled to consider these letters as substantive evidence because they were offered without objection, these letters, standing alone, do not demonstrate St. John the Baptist Church and St. Patrick Center are Archdiocese agencies or instrumentalities. The letters merely demonstrate Archdiocese agencies and instrumentalities are tax exempt. SEBA failed to offer any specific evidence St. John the Baptist Church and St. Patrick Center were listed in the directory to procure a tax exemption for these sales. The AHC's ruling was not unauthorized based upon the whole records and the evidence presented.

*Judicial Notice*

SEBA next argues it did not have to offer the directory into evidence because the AHC should have taken judicial notice of the directory's existence. Section 536.070(6) provides, in any contested case, "[a]gencies shall take official notice of all matters of which the courts take judicial notice." SEBA cites federal cases in which the courts took judicial notice of the directory's existence and contents. *See Sanzone v. Mercy Health*, 326 F. Supp. 3d 795, 806 (E.D. Mo. 2018) (citing the defendants' exhibit demonstrating an entity was listed in the directory and associated with the Roman Catholic Church);[10] *Overall v. Ascension*, 23 F. Supp. 3d 816, 824 (E.D. Mich. 2014) (taking judicial notice of the

---

[10] *Sanzone* was affirmed in part, reversed in part, and remanded on other grounds by *Sanzone v. Mercy Health*, 954 F.3d 1031 (8th Cir. 2020).

19

defendants' exhibits including the directory, which the court characterized as "a published book, widely disseminated, publicly available, and generally known"); *Hartwig v. Albertus Magnus Coll.*, 93 F. Supp. 2d 200, 202-03 (D. Conn. 2000) (stating a college was listed in the directory, "which is the definitive compilation of Roman Catholic Institutions in the United States"). These cases are distinguishable because the directory was offered as an exhibit in each of those cases prior to the court relying on its contents to declare an entity affiliated with the Roman Catholic Church. In this case, the directory was not offered into evidence, nor was any portion of the directory found in SEBA's exhibits.[11]  More importantly, SEBA never requested the AHC to take judicial notice of the directory.

SEBA also maintains it did not need to offer a document already in the department's possession because the October 2008 letter requires the Archdiocese to furnish the department with a current directory. Section 536.070(5) provides, "Records and documents of the agency which are to be considered in the case shall be offered in evidence so as to become a part of the record, … but the records and documents may be considered as a part of the record by reference thereto when so offered." SEBA never offered the directory into evidence, by reference or otherwise. SEBA failed to lay a foundation demonstrating the Archdiocese complied with the department's directive and provided it with an updated directory. Finally, SEBA failed to demonstrate St. John the Baptist and

---

[11] Arteaga testified he was involved heavily in the Archdiocese and was able to use his involvement to procure wholesale orders from several south St. Louis city churches, which comprised 80 percent of Eddie's revenue. It strains credulity neither SEBA nor Arteaga could procure a copy of the directory to present at the hearing to carry SEBA's burden of proof.

St. Patrick Center were listed in the directory at the time it made its wholesale orders to those entities. The AHC did not err in finding SEBA failed to carry its burden of proof to demonstrate by clear and unequivocal proof that these sales were tax exempt. This point is denied.

**5 Percent Addition to Tax Owed**

SEBA argues the AHC erred in assessing a 5 percent addition to tax pursuant to section 144.250.3. SEBA claims the AHC's ruling is unauthorized by law and unsupported by competent and substantial evidence on the whole record because the AHC ignored Arteaga's and Otten's undisputed testimony they double-checked SEBA's sales tax returns for accuracy and Otten used his best professional abilities to prepare the returns. The auditor found SEBA displayed "intentional disregard and negligence by failing to double check [its] sales tax figures to verify they were accurate." The AHC determined the 5 percent addition to tax was appropriate because SEBA failed to keep adequate records and the records it did retain were inconsistent, demonstrating SEBA's negligence in failing to report its full taxable sales.

Section 144.250.3 provides:

> In the case of failure to pay the full amount of tax required under sections 144.010 to 144.525 on or before the date prescribed … due to negligence or intentional disregard of rules and regulations, but without intent to defraud, there shall be added to the tax an amount equal to five percent of the deficiency. The director shall, upon request by a taxpayer, apprise the taxpayer of the factual basis for the finding of negligence, or the specific rules or regulations disregarded if the director assesses a penalty under this subsection.

21

The Western District ordered this case transferred believing this Court would need to construe section 144.250.3 because it does not define "negligence." *SEBA LLC v. Dir. of Revenue*, WD No. 83083, 2020 WL 3067497, at \*4 (Mo. App. W.D. June 9, 2020).

"This Court reviews the [AHC]'s interpretation of a revenue statute *de novo*." *St. Louis Rams*, 526 S.W.3d at 126. "This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Krispy Kreme*, 488 S.W.3d at 70 (quoting *Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009)). "Absent statutory definition, words used in statutes are given their plain and ordinary meaning with help, as needed, from the dictionary." *Am. Healthcare Mgmt., Inc. v. Dir. of Revenue*, 984 S.W.2d 496, 498 (Mo. banc 1999). This Court may consider "statutes involving related subject matter if such statutes provide necessary definitions or shed light on the meaning of the statute being construed," *Balloons Over the Rainbow, Inc. v. Dir. of Revenue*, 427 S.W.3d 815, 825 (Mo. banc 2014), "even though the statutes are found in different chapters and were enacted at different times." *Cook Tractor Co., v. Dir. of Revenue*, 187 S.W.3d 870, 873 (Mo. banc 2006). "When the legislature enacts a statute referring to terms that have had other judicial or legislative meaning attached to them, the legislature is presumed to have acted with knowledge of that judicial or legislative action." *Id*.

SEBA urges this Court to adopt the definition of negligence discussed in *Lora v. Director of Revenue*, 618 S.W.2d 630 (Mo. banc 1981), in which a taxpayer failed to file a sales tax return for business activities previously not subjected to sales tax, but a later reinterpretation of the same provision determined the activity was taxable. The AHC

22

affirmed the director's assessment of unpaid sales tax, and the taxpayer appealed. *Id*. at 632. This Court construed the sales tax statute of limitations provision addressing when a taxpayer neglects or refuses to file a return. *Id*. at 633. This Court construed "neglect" to refer "to negligent or careless failure to file a return." *Id*. at 634. This Court found the taxpayer was not negligent or careless because she exercised "reasonable prudence and good faith" based on a reasonable belief her business activities were not subject to taxation and reversed the penalty assessment. *Id*.

The director urges this Court to adopt the definition of negligence contained in 26 U.S.C. § 6662, which governs the imposition of accuracy-related penalties on underpayments for federal income tax purposes. This section defines "negligence" to include "any failure to make a reasonable attempt to comply with the provisions of this title …." 26 U.S.C. § 6662(c). This Court recognizes this provision applies to federal income tax as opposed to state income tax. Yet, this Court adopted this federal definition of negligence to construe section 143.751.1, which governs imposing additions to tax for income tax deficiencies. *Hiett v. Dir. of Revenue*, 899 S.W.2d 870, 872 (Mo. banc 1995). Section 143.751.1 provides, "If any part of a deficiency is due to negligence or intentional disregard of rules and regulations (but without intent to defraud) there shall be added to the tax an amount equal to five percent of the deficiency." In *Hiett*, this Court recognized the federal cases construing this provision defined negligence as "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Id*. *Hiett* stated, when applying this definition to Missouri tax law, "negligence is the failure to make a reasonable attempt to comply with the state tax laws pertaining to income tax

23

deductions … [and will] be evaluated under a 'reasonableness' standard." *Id*. This Court noted the taxpayer bore the burden of establishing the absence of negligence. *Id*.; *see also Hewitt Well Drilling & Pump Serv., Inc. v. Dir. of Revenue*, 847 S.W.2d 795, 798 (Mo. banc 1993) (citing section 621.050, RSMo Supp. 1992, as only specifying three instances in which the director bears the burden of proof before the AHC and explaining "the taxpayer carries the burden on *all* other issues"). This Court also "caution[ed] that reasonableness rather than good faith is the standard by which negligence is to be determined." *Hiett*, 899 S.W.2d at 873.

This Court finds it is appropriate to apply the federal definition of negligence and its subsequent application in *Hiett* here because they construe identical language contained in section 144.250.3. Under the federal provision, "[a] negligence penalty or addition is appropriate when the taxpayer failed to keep adequate records, absent an affirmative showing of no negligence." *Parrish v. Comm'r of Internal Revenue,* 168 F.3d 1098, 1102 (8th Cir. 1999). The record demonstrates SEBA negligently failed to maintain adequate records of its sales during the audit period by failing to maintain or provide individual sales receipts or records to verify the bank statements. SEBA did not utilize a secondary method to track retail sales. It is unreasonable for a business taxpayer to throw away receipts from its single sales tape. Reasonable business taxpayers should have a means to track inventory sales, which SEBA did not. Moreover, the auditor reminded SEBA of its obligation to maintain accurate, complete records going forward and for any of the requested periods during the audit, and SEBA failed to fulfill its obligation. SEBA only provided two days of receipts for the December 2014 period and did not retain records for the April 2015

24

through June 2015 period as requested. Moreover, the AHC found Arteaga not credible with respect to his explanation about the metal desk disposal containing SEBA's financial documents and exemption certificates. The AHC also questioned whether SEBA ever retained its wholesale records in the desk in light of Arteaga's testimony he assumed high dollar deposits were wholesale sales and low dollar deposits were retail sales. There was substantial and competent evidence in the record to support a finding SEBA was negligent by failing to make a reasonable attempt to comply with the state tax law recordkeeping requirements, which impacted its ability to verify its sales figures and file accurate sales tax returns.

*Reliance on Department Guidelines*

SEBA next argues the addition to tax was unauthorized because neither the auditor nor the AHC cited or relied on department guidelines, regulations, or caselaw authorizing an addition to tax when taxpayers fail to double-check their sales figures. SEBA asserts the auditor failed to check with her supervisor to see if the addition to tax was appropriate under these circumstances.

SEBA's contentions are without merit. Section 144.250.3's plain language provides sufficient authority for the auditor and AHC to assess an addition to tax due to negligence. With respect to department guidelines and regulations, the auditor admitted she was unaware of any case or department guideline assessing an addition to tax for failing to double check sale figures. She testified, however, she conferred with her supervisor, who approved the addition to tax. The auditor further explained the guidelines for assessing the addition to tax do not address every unique circumstance in which an addition may be

25

assessed because that determination is for the auditor. SEBA did not provide or cite any department guidelines or regulations it believes the auditor, the director, or the AHC misapplied in assessing the addition to tax. SEBA also faults the auditor and the AHC for failing to set forth their finding SEBA was negligent with particularity. Section 144.250.3 provides, "The director shall, *upon request by a taxpayer*, apprise the taxpayer of the factual basis for the finding of negligence, or the specific rules or regulations disregarded if the director assesses a penalty under this subsection." (Emphasis added). SEBA points to no evidence in the record it requested the auditor, the director, or the AHC to apprise it of the factual basis for their finding of negligence.

*Reliance on Professional Advice*

Finally, SEBA contends it was not negligent in reporting its taxable sales and filing its sales tax returns because it reasonably relied on Otten's professional advice as its tax accountant, unlike the taxpayers in *Hiett*, 899 S.W.2d at 873 (holding an addition to tax was appropriate when the taxpayers relied on their lay judgment as opposed to the professional advice of their accountant in disavowing taxable income), and in *Lynn v. Dir. of Revenue*, 689 S.W.2d 45, 49 (Mo. banc 1985) (holding an addition to tax was appropriate when the taxpayer was on notice of his tax liability but took no action despite counsel's advice he "should prepare himself"). SEBA seeks to distinguish *Hiett* because the taxpayers failed to make any reasonable attempt to comply with the tax law, while relying on their own lay judgment and affirmatively disavowing their accountant's professional advice regarding their tax liability. SEBA contends *Lynn* also is distinguishable because

26

Arteaga was not an experienced businessman as was the taxpayer in *Lynn*, but rather aligns himself with the uneducated taxpayer in *Lora*.

This is not an instance in which Otten provided Arteaga with erroneous advice. Otten testified he used the records Arteaga provided to prepare the tax returns. SEBA's reliance on Otten's professional services in preparing its tax returns does not account for SEBA's failure to maintain adequate business records under section 144.320 for Otten to consult when preparing the returns. SEBA argues it was Arteaga's intent to rely upon Otten's professional preparation and there was no evidence in the record he misled or deceived Otten about Eddie's taxable sales. However, Otten's professional services can only extend as far as the accuracy and completeness of the records Arteaga provided, which the record amply demonstrated were inaccurate and incomplete due to SEBA's negligence. "[E]ven where a taxpayer relies on professional advice, that reliance is not always sufficient to avoid a penalty." *Hiett*, 899 S.W.2d at 873.

SEBA maintains there was no evidence in the record Arteaga or Otten underreported Eddie's retail sales or they engaged in activities designed to evade or avoid SEBA's tax obligation. SEBA again relies on section 536.070(8) to compel the AHC to accept this absence of evidence as probative. Yet, the AHC found Arteaga was not credible at times, especially with respect to his methods of distinguishing wholesale and retail sales amounts. The record contains substantial and competent evidence to affirm the AHC's decision to assess an addition to tax pursuant to section 144.250.3 due to SEBA's negligence in maintaining its business records, which impacted its ability to verify its sales figures and file accurate sales tax returns. This point is denied.

27

**Conclusion**

The AHC's decision was supported by substantial and competent evidence on the whole record.  The AHC's decision is affirmed.

 

 

_____
GEORGE W. DRAPER III, Chief Justice


All concur.